Nos. 12-3235, 12-3241, 12-3281, 12-3292, 13-1052, 13-1055,
13-1056, 13-1060, 13-1433, 13-1435, 13-1449 & 13-1450

———————————————————

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————————————

BCS, INC. and PHOENIX BOND
& INDEMNITY COMPANY,
Plaintiffs-Appellees,

v.

BG INVESTMENTS, INC., et al.
and MD SASS INVESTORS
SERVICES, INC. et al.,
Defendants-Appellants.

———————————————————————————————————————

Appeals from the United States District Court
For the Northern District of Illinois, Eastern Division,
Case Nos. 05 C 4095 and 07 C 1367
The Honorable Judge Matthew F. Kennelly

———————————————————————————————————————

BRIEF AND REQUIRED SHORT APPENDIX OF DEFENDANTS-APPELLANTS
BG INVESTMENTS, INC, BONNIE J. GRAY, BONNIE GRAY AS THE
EXECUTOR OF THE ESTATE OF DAVID R. GRAY AND TRUSTEE OF THE
DAVID GRAY REVOCABLE TRUST, MIDWEST REAL ESTATE INVESTMENT
CO., MIDWEST REAL ESTATE INVESTMENT CO. EMPLOYEES' PROFIT
SHARING PLAN & TRUST and ATLANTIC MUNICIPAL CORP.

———————————————————————————————————————

Edward F. Malone (Counsel of Record)
Sharon E. Calhoun
Barack Ferrazzano Kirschbaum & Nagelberg LLP
200 W. Madison, Suite 3900
Chicago, Illinois 60606
Tel:  (312) 984-3100
Fax:  (312) 984-3150
edward.malone@bfkn.com

836204.v20

## RULE 26.1 DISCLOSURE STATEMENT

*(1)    The full name of every party that the attorney represents in the case:*

BG Investments, Inc., Bonnie J. Gray, Midwest Real Estate Investment Company,

Midwest Real Estate Investment Company Employees' Profit Sharing Plan and

Trust, Atlantic Municipal Corporation and Bonnie Gray as executor of the Estate of

David R. Gray and trustee of the David Gray Revocable Trust

*(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:*

Barack Ferrazzano Kirschbaum & Nagelberg LLP

Edward F. Malone, Sharon E. Calhoun

*(3)    If the party or amicus is a corporation:*

*i) Identify all its parent corporations, if any:*  N/A

*ii) List any publicly held company that owns 10% or more of the party's or*

*amicus' stock:*  N/A

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... iv

JURISDICTIONAL STATEMENT ........................................... 1

ISSUES PRESENTED .......................................................... 2

STATEMENT OF THE CASE.................................................. 4

STATEMENT OF FACTS ....................................................... 6

SUMMARY OF THE ARGUMENT ......................................... 18

ARGUMENT .................................................................... 22

I.    There Was Insufficient Evidence for the Jury to Find Mail Fraud. ........... 22

      A.    Standard of Review................................................... 22

      B.    There Was Insufficient Evidence for the Jury to Find that the
            Gray Defendants Intentionally Made False Statements Because
            Plaintiffs Did Not Negate the Evidence that the Gray
            Defendants' Interpretation of the SSB Rule Was Reasonable........... 22

            1.    The SSB Rule is ambiguous. ....................................... 23

            2.    The Grays' interpretation of the SSB Rule was
                  reasonable. .................................................. 25

            3.    Plaintiffs did not negate the Grays' reasonable
                  interpretation............................................... 26

            4.    There was no evidence that Bonnie Gray had fraudulent
                  intent. ..................................................... 27

      C.    Plaintiffs Presented No Evidence that the Gray Defendants'
            Alleged Misrepresentations Were Material......................... 28

II.   The Trial Court's Instructions on Intent and Good Faith Were
      Legally Insufficient Because They Failed to Adequately Inform the
      Jury of the Gray Defendants' Defense Theory............................ 30

      A.    Standard of Review................................................... 30

      B.    The Jury Instructions on Good Faith and Intent Did Not
            Adequately Inform the Jury of the Gray Defendants' Theory
            that Their Interpretation of the SSB Rule Made Their
            Statements True. .................................................. 31

III.  No Predicate Acts of Mail Fraud Occurred Because Plaintiffs Were
      Not Deprived of their Property........................................ 33

IV.   The Gray Defendants Deserve a New Trial Because the Jury Was
      Not Properly Instructed on the Property Interest Required for Mail
      Fraud. ............................................................... 33

V.      The District Court Erred When It Admitted the Statistical
        Methodology of Plaintiffs' Damages Expert Without Reviewing It for
        Compliance with *Daubert.*...........................................................................34

        A.      Standard of Review.................................................................................34

        B.      The Video Bid Adjustment was a Statistical Method Subject to
                Daubert Review.......................................................................................34

        C.      The Video Bid Adjustment Was Not a Reliable Statistical
                Method...................................................................................................38

VI.     The District Court Erred in Upholding the Jury's Damages Award
        Where Plaintiffs' Damages Evidence Failed to Disaggregate the
        Damages. ........................................................................................................40

        A.      Standard of Review.................................................................................40

        B.      Shaffer's Calculation of Plaintiffs' "Bid Win Percentage"
                Improperly Attributed to the Gray Defendants Losses Caused
                by the Participation in the Tax Sales of Other Unrelated
                Parties. ..................................................................................................40

VII.    Plaintiffs Were Not Entitled to Punitive Damages. ....................................43

        A.      Standard of Review.................................................................................43

        B.      The Jury's Award of RICO Treble Damages and State Law
                Punitive Damages for the Same Injury Violated Illinois Law............43

VIII.   The District Court's Allocation of $9,785,741.35 of Attorneys' Fees
        and Costs to the Gray Defendants was an Abuse of Discretion..................45

        A.      Standard of Review.................................................................................45

        B.      The District Court Abused Its Discretion by Apportioning
                $9,783,741.35 in Fees and Costs to the Gray Defendants
                Without Explanation Where the Award Was Disproportionate
                to the Resources Devoted to Proving the Case Against the Gray
                Defendants and the Damages Award Against those Defendants........45

        C.      District Court Abused Its Discretion by Not Allocating Some
                Portion of Plaintiffs' $9.5 Million Settlements to Their Fee
                Awards...................................................................................................47

CONCLUSION........................................................................................................48

CERTIFICATE OF COMPLIANCE .......................................................................50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<span style="font-variant:small-caps">ASES</span>

*Am. Honda Motor Corp., Inc. v. Allen,*
    600 F.3d 813 (7th Cir. 2010) ..................................................................35, 38

*Apple v. Motorola,*
    No. 11-cv-08540, 2012 WL 1959560 (N.D. Ill. May 22, 2012)...................37

*ATA Airlines, Inc. v. Fed. Express Corp.,*
    665 F.3d 882 (7th Cir. 2011) ...................................................35, 37, 38, 39

*Cress v. Recreation Serv., Inc.,*
    795 N.E.2d 817 848-49 (Ill. App. 2003)........................................................45

*Daubert v. Merrell Dow Pharms.,*
    509 U.S. 579 (1993) ....................................................................... *passim*

*Davis v. Suran,*
    No. 98 C 656, 1998 U.S. Dist. LEXIS 10237 (N.D. Ill. July 1, 1998) .......43

*DeKoven v. Plaza Assocs.,*
    599 F.3d 578 (7th Cir. 2010) ........................................................................35

*Espenscheid v. Directstat USA, LLC,*
    705 F.3d 770 (7th Cir. 2013) ...........................................................35, 37, 39

*Gerber v. MTC Elec. Techs. Co., Ltd.,*
    329 F.3d 297 (2d Cir. 2003) .........................................................................47

*Harris v. Manor Healthcare Corp.,*
    489 N.E.2d 1374 (Ill. 1986).........................................................................44

*Hess Oil Virgin Islands Corp. v. UOP, Inc.,*
    861 F.2d 1197 (10th Cir. 1988) ...................................................................48

*Huff v. Sheahan,*
    493 F.3d 893 (7th Cir. 2007) .......................................................................30

*Isaksen v. Vermont Castings, Inc.,*
    825 F.2d 1158 (7th Cir. 1987) .....................................................................41

*Kunz v. DeFelice,*
    538 F.3d 667 (7th Cir. 2008) .......................................................................34

*Leon v. Caterpillar Indus., Inc.*,
    69 F.3d 1326 (7th Cir. 1995) ........................................................33

*Liquid Air Corp. v. Rogers*,
    834 F.2d 1297 (7th Cir. 1987) ......................................................44

*Marsella v. Shaffer*,
    754 N.E.2d 411 (Ill. App. Ct. 2001)..............................................44

*Massey v. Blue Cross-Blue Shield of Ill.*,
    226 F.3d 922 (7th Cir. 2000) ........................................................22

*May v. Chrysler Group, LLC.*,
    692 F.3d 734 (7th Cir. 2012) ...................................................22, 40

*MCI v. AT&T*,
    708 F.2d 1081, 1162 (7th Cir. 1982) ....................................... 40

*Monroe v. United Air Lines, Inc.*,
    736 F.2d 394, 400-402 (7th Cir. 1984)................................... 30

*Movitz v. First Nat'l Bank of Chi.*,
    148 F.3d 760 (7th Cir. 1998) .............................................40, 42, 43

*Neder v. United States*,
    527 U.S. 1 (1999).........................................................................28

*Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*,
    125 F.3d 468 (7th Cir. 1997) ........................................................33

*Paulson v. Cnty. of DeKalb*,
    644 N.E.2d 37 (Ill. App. Ct. 1994)................................................44

*People ex rel. Fahner v. Climatemp, Inc.*,
    428 N.E.2d 1096 (Ill. App Ct. 1981)..............................................44

*Perez v. Z Frank Oldsmobile*,
    223 F.3d 617 (7th Cir. 2000) .................................................43, 44, 45

*Rexam Beverage Can Comp. v. Bolger*,
    620 F.3d 718 (7th Cir. 2010) ........................................................40

*Rosen v. Ciba-Geigy Corp.*,
    78 F.3d 316 (7th Cir. 1996)..........................................................35

*Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.*,
    574 F.3d 852 (7th Cir. 2009) ........................................................45

*Schultz v. R.I. Hosp. Trust Nat'l Bank, N.A.*,
   94 F.3d 721 (1st Cir. 1996) .......................................................................27

*United States ex rel. Lamers v. City of Green Bay*,
   168 F.3d 1013 (7th Cir. 1999) .................................................................22

*United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin. Corp.*,
   No. 08 CV 48, 2011 WL 976482 (D. Neb. Mar. 15, 2008) .........................26

*United States v. Anderson*,
   579 F.2d 455 (8th Cir. 1978) ...................................................................23

*United States v. Fenzl*,
   670 F.3d 778 (7th Cir. 2012) .................................................................6, 29

*United States v. Isley*,
   No. 08-14534, 2010 WL 801736 (11th Cir. Mar. 10, 2010)..................31, 32

*United States v. Kersulis*,
   No. 00 CV 0636, 2007 U.S. Dist. LEXIS 6341 (E.D. Ark. Jan. 29, 2007)..........23, 26

*United States v. Migliaccio*,
   34 F.3d. 1517 (10th Cir. 1994) ..........................................................23, 31, 32

*United States v. Thyfault*,
   579 F.3d 748 (7th Cir. 2009) ...................................................................22

*Va. Acad. of Clinical Psychologists v. Blue Shield of Va.*,
   543 F. Supp. 126 (E.D.Va. 1982) .............................................................48

*Verdonck v. Scopes*,
   590 N.E.2d 545 (Ill. App. Ct. 1992)..........................................................44

**RULES**

Fed. R. Evid. 702...........................................................................................16

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case based on a federal question pursuant to 18 U.S.C. §§1961, 1962(c), 1962(d), and 1964. The district court also had supplemental jurisdiction over the Plaintiffs' state law claim for tortious interference with prospective business advantage pursuant to 28 U.S.C. §1367 because that claim forms part of the same case or controversy.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291, because it is an appeal of a final decision of the district court.

The following are facts relevant to this Court's jurisdiction:

1.     On January 25, 2012, the district court entered a final judgment pursuant to FRCP 58 against the Gray Defendants[1].

2.     Prior to that, on December 13, 2011, the Gray Defendants filed a Renewed Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial ("Rule 50(b) Motion"), which tolled the time for this appeal.

3.     On September 5, 2012, the district court denied the Rule 50(b) Motion ("Rule 50 Order").

4.     The Gray Defendants timely filed their Notice of Appeal on October 1, 2012.

---

[1] Gray Defendants refers to Defendants-Appellants BG Investments, Inc. ("BG"), Bonnie Gray, Bonnie Gray as the Executor of the Estate of David R. Gray & Trustee of the David Gray Revocable Trust ("Estate"), Midwest Real Estate Investment Co. ("Midwest"), Midwest Real Estate Investment Co. Employees' Profit Sharing Plan & Trust ("Midwest Plan"), and Atlantic Municipal Corp. ("Atlantic"). Plaintiffs asserted that the Gray Defendants participated in a RICO enterprise with Timothy Gray and Wheeler-Dealer Ltd. ("Wheeler-Dealer Defendants" collectively with Gray Defendants, the alleged "Gray Enterprise"), both of whom were dismissed from the case after the jury failed to reach a verdict against them.

5.      On December 21, 2012 and December 22, 2012, the district court entered final orders against the Gray Defendants awarding Plaintiffs attorneys' fees and expenses ("December Fee Orders").

6.      On January 7, 2013, the Gray Defendants timely appealed the December Fee Orders.

7.      On February 5, 2013, this Court remanded the case to the district court for modification of the December Fee Orders pursuant to Rule 60(a).

8.      On February 8, 2013, the district court granted the Plaintiffs' Rule 60(a) motion, and corrected its December Fee Orders.

9.      On February 28, 2013, the Gray Defendants timely amended their appeal of the December Fee Orders as corrected in the February 8, 2013 order ("Final Fee Order").

## ISSUES PRESENTED

1.      Did the district court err as a matter of law in denying the Gray Defendants' Rule 50(b) Motion where Plaintiffs failed to negate the evidence that the Gray Defendants' interpretation of the Cook County Treasurer's Single Simultaneous Bidder Rule ("SSB Rule" or "Rule") was reasonable?

2.      Did the district court err as a matter of law in denying the Gray Defendants' Rule 50(b) Motion where Plaintiffs failed to present evidence that the Gray Defendants' alleged misrepresentations would have caused the Treasurer to bar them from any tax sale, and thus failed to establish that the alleged misrepresentations were material as a matter of law?

3.      Did the district court err as a matter of law in giving a jury instruction on "good faith" that failed to adequately inform the jury of the legal implications of the Gray Defendants' defense that their interpretation of the SSB Rule was reasonable?

4.      Did the Plaintiffs' RICO claims fail as a matter of law where no predicate acts of mail fraud occurred because no victim in this case was deprived of property?

5.      Whether the Gray Defendants deserve a new trial where, given Plaintiffs' shifting theories, the district court insufficiently instructed the jury on what is required to prove mail fraud?

6.      Did the district court err as a matter of law when it admitted an expert damages opinion employing an unreliable statistical methodology without reviewing the methodology under *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993)?

7.      Did the district court err as a matter of law in denying the Gray Defendants' Rule 50(b) Motion where the jury apportioned to the Gray Defendants losses caused by the conduct of parties unrelated to the Gray Defendants?

8.      Did the district court err as a matter of law in refusing to overturn the jury's award of state law punitive damages where this Court has held that Illinois law prohibits the award of both punitive and treble damages for the same wrong?

9.      Did the district court abuse its discretion when it a) charged the Gray Defendants with 80 percent of the total award of attorneys' fees and costs expended

in prosecution of all of the defendants in both cases, without determining which fees were incurred in work on Plaintiffs' claims against the Gray Defendants, and without taking into account whether the fee award was proportional to the amount of damages and b) failed to allocate a portion of the settlements received by Plaintiffs to fees and costs?

## STATEMENT OF THE CASE

The Gray Defendants were not named as defendants in the first RICO complaint filed by Plaintiffs in 2005 ("2005 Case"). Plaintiffs sued the Gray Defendants on March 9, 2007 ("2007 Case") alleging RICO and state tort causes of action against BG, its owner Bonnie Gray, and the Wheeler-Dealer Defendants. Plaintiffs alleged that BG, Bonnie and the Wheeler-Dealer Defendants were members of a so-called "Gray Enterprise" and conspired to violate the SSB Rule which prohibits bidding by related entities, during the 2003-2005 tax lien auctions ("Tax Sales") conducted by the Cook County Treasurer ("Treasurer").

Plaintiffs changed their theory of the case against the Gray Defendants. Their First and Second Amended Complaints added as defendants additional alleged members of the "Gray Enterprise," Atlantic, Midwest, Midwest Plan, and David Gray. The Second Amended Complaint alleged that members of the "Gray Enterprise" purchased tax liens at the 2003-2007 Tax Sales for the benefit of Midwest, a non-bidder that provided research and lien management services to BG, Atlantic and Wheeler-Dealer. The Second Amended Complaint asserted RICO claims under 18 U.S.C. §§1962(c), 1962(d) and 1964, and claims for tortious

interference with prospective business advantage under Illinois law. The Third

Amended Complaint was identical to the Second Amended Complaint in all respects

regarding the Gray Defendants.

*The Trial and the Rule 50 Motions*

The 2005 Case and the 2007 Case proceeded to trial together in October 2011.

At the close of the Plaintiffs' case, the Gray Defendants filed a Rule 50(a) motion,

which they renewed at the close of the evidence. The district court did not rule on

the Rule 50(a) motion before the jury returned its verdict. On November 7, 2011, the

jury reached verdicts against some, but not all defendants of the alleged "Gray

Enterprise," as illustrated below.

| Count | Bonnie Gray | BG | David Gray | Midwest | Midwest Plan | Atlantic | Timothy Gray | Wheeler Dealer |
|---|---|---|---|---|---|---|---|---|
| **Count V** Substantive RICO | Liable | Liable | Liable | Liable | Liable | Liable | No Verdict | No Verdict |
| **Count VI** RICO Conspiracy | Not Liable | Liable | Liable | Liable | Liable | Liable | No Verdict | No Verdict |
| **Count VII** Tortious Interference | Not Liable | Liable | Liable | Liable | Liable | Liable | No Verdict | No Verdict |

The jury awarded Plaintiffs the following damages against the Gray

Defendants:

| Plaintiff | Compensatory Damages | Punitive Damages |
|---|---|---|
| BCS | $ 363,000 (x 3 = $1,089,000) | $ 291,000 |
| Phoenix Bond | $ 304,625 (x 3 = $913,875) | $ 351,300 |

Total                          $ 667,625 (x 3 = $2,002,875)              $ 642,300

On December 13, 2011, the Gray Defendants filed their Rule 50(b) Motion requesting judgment as a matter of law, or in the alternative a new trial. On March 5, 2012, the Gray Defendants supplemented its Rule 50(b) Motion with this Court's February 2012 decision in *United States v. Fenzl,* 670 F.3d 778 (7th Cir. 2012).

*Post-Trial Orders*

On January 2, 2012, the district court ruled, among other things, that both RICO treble damages and punitive damages were permissible, and that the Gray Defendants were not entitled to setoff for Plaintiffs' settlements with unrelated Defendants.

Because the jury could not reach a verdict as to the Wheeler-Dealer Defendants, the district court declared a mistrial as to those defendants, and on January 4, 2012 dismissed the claims against them with prejudice.

On January 25, 2012, the district court entered judgment against the Gray Defendants in the amounts described above. On September 5, 2012, the district court denied the Gray Defendants' Rule 50(b) Motion.

In its Final Fee Order, the district court awarded Plaintiffs $13,072,399.77 in attorneys' fees and costs.

## STATEMENT OF FACTS

*The Annual Cook County Tax Sale*

Each year, the Cook County Treasurer's Office ("Treasurer's Office") conducts the Tax Sale where tax liens are awarded to the registered bidder that bids the

lowest penalty amount the property owner must pay to redeem the lien. (Tr. 234;

JA002-004.) [2] The Tax Sales are described more fully in the Sass Defendants'

Statement of Facts.

*The Cook County Treasurer's SSB Rule*

Around 2001, the Treasurer's Office enacted the SSB Rule for the Tax Sales,

which provided:

> One tax buying entity (principal) may not have
> its/his/her/their actual or apparent agents, employees,
> or related entities, directly or indirectly register under
> multiple registrations for the <u>intended or perceived</u>
> purpose of having more than one person bidding at the
> tax sale at the same time for the <u>intended or perceived</u>
> purpose of increasing the principal's likelihood of
> obtaining a successful bid on a parcel.

(emphasis in original) (PX. 390,12.) [3]

The Rule defined a Related Bidding Entity as "any individual…or…entity

that [has] a shareholder, partner, principal, officer, general partner or other person

or entity having an ownership interest in common with, or contractual relationship

with, any other registrant in the [Tax Sale]." (*Id.*) The Rule notified registrants that

"[t]he determination of whether registered entities are related, so as to prevent the

entities from bidding at the same time, …is in the sole and exclusive discretion of

the Cook County Treasurer or her designated representatives." (*Id.*)

---

[2] "Tr. __" refers to the trial transcripts. "JA __" refers to the Separate Joint Appendix of the
BG and Sass Appellants. "SA __" refers to the attached Short Appendix. "PX. __" refers to
Plaintiffs' trial exhibits. "DX. __" refers to Defendants' trial exhibits. Unless stated
otherwise, "Dkt." refers to the docket number for Case No. 05 C 4095.
[3] The quoted language is from the 2005 version of the Rule contained in the 2005 Tax Sale
registration materials. (PX. 390.)

The Rule was contained in the registration materials for all Tax Sales conducted during 2003-2007. All Tax Sale registrants were required to certify their compliance with the Rule. (JA112-13; PX. 386, 388, 390, 393, 395.) Beginning with the Tax Sale conducted in 2004, each registrant was also required to make representations and warranties that it "[was] not affiliated with any other entity or person registering to bid at the [Tax Sale] in that"

> (A) It has no capital, purchase money, or other finances in common with any other bidding entity or person registering to bid at the [Tax Sale];
> (B) It shares no common ownership interest or common source of funds with any other bidding entity or person registering to participate at the [Tax Sale];
> (C) It has no agreements to purchase or sell any parcels successfully bid at the [Tax Sale] by any other registering bidding entity or person at the [Tax Sale];
> (D) It has no agreements to purchase or sell any parcels successfully bid on at the [Tax Sale].
> (E) It does not stand to gain financially pursuant to an agreement with another bidding entity registering for the [Tax Sale] concerning parcels to be bid upon or purchased by such other entity at the [Tax Sale].

(PX. 390,10-11.)

*The Gray Family*

David Gray began purchasing tax liens before 1970. Mr. Gray, who died in 2010, was the sole owner of Midwest, a corporation he bought in 1971. (JA0014.) By 2003, the beginning of the alleged RICO conspiracy, Midwest was no longer purchasing tax liens. During the relevant period, Midwest only provided research and management services to the tax lien businesses owned by other members of the Gray family. (JA0030-31.)

Between 1993-1996, Mr. Gray participated in establishing companies through which his wife and children could purchase tax liens. (JA0022-24.) BG was created in 1993 and has always been owned by Bonnie Gray, David's widow. Since mid-2004, Atlantic has been owned by three of David's children: David, Jr., Laura, and Ricky. Wheeler-Dealer was created in 1996 and has always been wholly owned by David's fourth child, Timothy. (JA0015-25.) Before 2001, BG, Atlantic, Wheeler-Dealer, and other companies, were all included on combined financial statements because at that time they shared financing. (JA102:1-104:17.) Wheeler-Dealer was removed from those financial statements in 2001, when it became financially independent, though the statements continued to reflect that Wheeler-Dealer paid a management fee to Midwest. (JA104-07.) Midwest's accountant allocated management fees across the entities that purchased Midwest's management services. (JA105, 108-09.)

*The 2011 Trial*

       1.    *Evidence of the Gray Defendants' Compliance with the SSB Rule*

Plaintiffs claimed the Gray Defendants and the Wheeler-Dealer Defendants participated in a single RICO enterprise, the "Gray Enterprise," conspiring to violate the SSB Rule, falsely representing that they were in compliance with the Rule in registrations submitted for the Tax Sales conducted during 2003-2007. (Tr. 246-48.) Plaintiffs claimed that Midwest served as the hub of the Gray Enterprise. (Tr. 246.) The Gray Defendants responded that they did not knowingly make false statements in their registrations because they did not believe the Gray Defendants

who participated in the Tax Sales were "related" to the Wheeler-Dealer Defendants under the terms of the Rule. (JA0068-70, 85.)

### The 2003-2005 Tax Sales

The evidence showed that BG and Wheeler-Dealer were the only members of the alleged "Gray Enterprise" that participated in the 2003-2005 Tax Sales. (JA0027-29.) Bonnie Gray submitted the registrations on behalf of BG. (PX. 386, 388, 390.) Timothy Gray submitted the registrations on behalf of Wheeler-Dealer. (JA0050-54.) Wheeler-Dealer assigned certain liens it purchased at the 2003 Tax Sale to Midwest Plan. Plaintiffs admitted these assignments did not violate the Rule. (JA0097-98.)

Timothy and Bonnie Gray testified that there was no common ownership, financial, contractual, or operational relationship between BG and Wheeler-Dealer during 2003-2005, or at any other time. (JA0065, 86-87.)[4] BG and Wheeler-Dealer did not share any capital or purchase money, never assigned purchased liens to each other, and had no financial arrangement with each other regarding purchased liens. (JA0033, 64-65.)

Timothy Gray testified that he solely made the decisions concerning every lien on which Wheeler-Dealer bid. (JA0072.) David Gray testified that he managed the operations of BG and made the decisions concerning what liens BG purchased. (JA0018-20.)

---

[4] David Gray died before trial. Mr. Gray's testimony was presented via deposition. Mrs. Gray's testimony was also presented via deposition because she was undergoing radiation treatment at the time of trial.

### The 2006-2007 Tax Sales

Atlantic and Wheeler-Dealer each participated in the Tax Sales held during 2006-2007. (JA0028, 82:2-6.) Timothy Gray submitted the registrations on behalf of Wheeler-Dealer. (JA0050-54.) BG did not participate in the 2006-2007 Tax Sales. (JA0028.)

Timothy Gray testified that during 2006-2007, Atlantic and Wheeler-Dealer had no common ownership, financial, contractual, or operational relationship. (JA0064-65.) Atlantic and Wheeler-Dealer did not share any capital or purchase money. (JA0065.) Atlantic and Wheeler-Dealer never assigned liens to each other from those sales, and had no financial arrangement regarding liens from the sales. (JA0063.) In 2001, Atlantic made a loan to Wheeler-Dealer that was paid off before the 2006 Tax Sale. (JA0055-62, 110.) David Gray testified that he managed the day-to-day operations of Atlantic and made the decisions concerning what liens Atlantic purchased. (JA0041-48.) As in 2003-2005, Timothy independently made all the management and lien buying decisions for Wheeler-Dealer. (JA0072.)

### The Tax Buyers' Relationship with Midwest and David Gray

BG, Wheeler-Dealer and Atlantic each purchased Tax Sale-related services from Midwest. BG and Wheeler-Dealer purchased Midwest's services in 2003-2005, and Atlantic and Wheeler-Dealer purchased Midwest's services in 2006-2007. Atlantic, BG and Wheeler-Dealer separately compensated Midwest for the services rendered to each respective company. (JA0034-35.) Plaintiffs admitted at trial that it was not a violation of the Rule for two entities to use the same research or management service in connection with a Tax Sale. (JA0006-07, 09, 95-96; Tr. 606-

11.) Employees of Midwest also bid on behalf of BG and Atlantic at the 2003-2007 Tax Sales, and managed the liens purchased by BG and Atlantic. (JA0041-47.) Employees of Midwest did not bid on behalf of Wheeler-Dealer, and Midwest employees have never bid on behalf of more than one entity at the same Tax Sale. (JA0036, 39.) Neither BG, Atlantic nor Wheeler-Dealer assigned any tax liens to Midwest.

Wheeler-Dealer was financed separately from Midwest, BG and Atlantic. The evidence showed that BG, Atlantic and Midwest were all borrowers on a joint line of credit guaranteed by David Gray. BG (in 2003-2005) and Atlantic (in 2006-2007) used this line of credit to purchase liens. (JA0020-21.) Wheeler-Dealer used an independent line of credit from LaSalle, guaranteed by David Gray at the request of the bank, to purchase liens at the 2003-2007 Tax Sales. (JA0020-22.) During the 2003-2005 and 2006-2007 Tax Sales, the two bidders never shared related, or joint, lines of credit. (*Id.*)

2.    *Evidence Regarding the Meaning and Enforcement of the SSB Rule.*

Timothy Gray testified about his understanding of the Rule and the representations and warranties included in the registration materials during 2004-2007. Timothy believed Wheeler-Dealer was in compliance with the Rule because it did not share any ownership with BG or Atlantic, had no contractual relationship with BG or Atlantic, and was not using the same money to bid as BG in 2003-2005 or Atlantic in 2006-2007. (JA0065-70.)

Plaintiffs' witnesses also testified about their understanding of the Rule. Andrew Marks, an owner of Phoenix Bond and its principal bidder, testified that the Rule prohibits multiple bidders from participating in Tax Sales contemporaneously for the "same registrant." (JA0011-12.) Stanford Marks, an owner of Phoenix Bond, testified that he understood the Rule prohibited a registrant from having a prior arrangement with another bidder at the Tax Sale who would benefit from the registrant's participation in the sale. (JA0005.) Janet Meyers, the principal bidder for BCS, testified that she understood the Rule was not violated if a registrant bid solely for its own benefit. (JA0099.)

Martha Mills, chief legal counsel for the Treasurer's Office in 2003-2004, testified that the Rule was subject to different interpretations and that applying the Rule to hypothetical facts would be speculation. (JA131-32.) Ms. Mills further testified that the representations and warranties are subject to different interpretations, that the phrase *"finances in common"* used in subparagraph (A) of the representations and warranties might mean many different things, and that it would be speculation for her to define the term. (JA125-26.)

Timothy Gray testified that the Treasurer's Office knew Timothy was David Gray's son and that he was participating in the Tax Sales. (JA0070-71, 73-74.) Timothy testified that in 2001, a bidder complained about Wheeler-Dealer's participation in the Tax Sale and Timothy was required to provide documentation to Ms. Mills showing that he owned 100% of Wheeler-Dealer. Ms. Mills allowed Wheeler-Dealer to continue participating in the Tax Sale after she verified his

13

ownership of Wheeler-Dealer. (JA0073-74.) Ms. Mills testified that the

determination of whether the Rule had been violated was made by the Treasurer.

(JA116-17.)

*The Jury Instructions on Good Faith*

The Defendants proposed a jury instruction on "good faith." (JA206.) The

district court refused to give the Defendants' proposed instruction, and instead gave

the following instruction:

> Good faith on the part of a defendant is inconsistent
> with intent to defraud. A defendant is not required to
> prove that it acted with good faith; rather, the plaintiffs
> must prove that the defendant acted with the intent to
> defraud.

(JA205.) Defendants objected to the Court's proposed instruction and argued their

objections at the November 2011 jury instruction conference. (Dkt. 878; SA0037-38.)

*The Evidence of Plaintiffs' Damages*

1.     Shaffer's Methodology

Plaintiffs presented testimony from Scott Shaffer ("Shaffer"), a certified

public accountant (JA134:12-13), to establish damages. Shaffer offered an opinion

about the liens Plaintiffs would have won, and profits they would have earned, but

for Defendants' alleged violation of the Rule. (JA136:1-5, 162:15-18.)

In order to calculate lost profits, Shaffer first predicted the number of 0% bids

Plaintiffs would have won if certain parties (all the Defendants plus members of the

"Peters Group," defendants in a separate state case who settled with Plaintiffs) had

not participated in the sale. (JA159:21-162:18.) Shaffer assumed all these parties

were not eligible to bid at the Tax Sales. Shaffer developed a method to make this

prediction using documents created by Plaintiffs' counsel in 2009, which Shaffer assumed were based on lists of liens on which Plaintiffs had intended to bid. Using this method, Shaffer reallocated bids won by the alleged Gray Enterprise, and the other alleged enterprises, to each of the Plaintiffs. (JA140:19-157:6, 171:6-172:14, 191:6-15, 196:11-25.)

Shaffer's reallocation methodology involved several steps. In order to determine how many 0% bids Plaintiffs lost to Defendants, Shaffer first determined which of the 0% liens Defendants won were bid on by Plaintiffs. (JA144:5-23, 145:15-18.) However, Shaffer did not have Plaintiffs' actual bid lists for any particular sale, only the counsel-prepared lists of the 0% liens on which Plaintiffs had *intended* to bid. (JA171-73.) So he estimated the number of bids Plaintiffs actually lost to Defendants by comparing the lists of Plaintiffs' intended bids against lists of 0% liens actually won by Defendants. (JA146:1-11.)

Schaffer then used the only record he had of the bids Plaintiffs actually placed at any Tax Sale – a video of two hours of two days of the 2007 Tax Sale, which contained footage of less than 1% of the 528 hours of Tax Sales during 2003-2007. (JA148:22-150:1, 170, 178:17-179:13). Shaffer concluded that Plaintiffs did not bid on every 0% lien on their intended bid lists. (JA148:22-149:7.) Shaffer concluded that during the 2-hour period shown on the video, BCS did not bid on about 19% and Phoenix did not bid on about 22% of the liens on their intended bid lists. (JA149:4-150:25.) Shaffer extrapolated these ratios across *all* Tax Sales during 2003-2007 to estimate the number of actual bids made by each Plaintiff at each Tax

Sale. Shaffer called this adjustment the "Video Bid Adjustment." (JA148:22-151:20.)

Once he had calculated the number of bids *eligible* for reallocation from Defendants to Plaintiffs, Shaffer calculated Plaintiffs' historical bidding success against what he called "Eligible Bidders" – a group that excluded the Defendants and the Peters Group. (JA155:15-156:22.) Specifically, Shaffer divided the number of 0% bids won by each Plaintiff each year by the number of 0% bids won that year by the entire group of assumed "Eligible Bidders." Shaffer labeled the resulting number for each Plaintiff its "Bid Win Percentage." (JA54:23-156:6.) The more parties Shaffer excluded from the group of "Eligible Bidders," the higher the damages his model assessed against each defendant. (JA157:1-6, 192:2-4, 14-16, 193:4-10.)

To calculate the bids to be reallocated from the Gray Defendants to the Plaintiffs, Shaffer multiplied each Plaintiff's "Bid Win Percentage" by the number of 0% liens won by the Gray Enterprise eligible for reallocation. The product was Shaffer's estimate of the number of liens each Plaintiff would have won but for the Gray Enterprise's alleged violation of the Rule. (JA154:23-156.)

### 2.  Motions to Bar Shaffer

In June 2010, several defendants filed motions to bar Shaffer's testimony pursuant to Fed. R. Evid. 702 and *Daubert*, 509 U.S. 579, because his method for reallocating liens to Plaintiffs was unreliable. (JA207; 07 Dkt. 776.) The district court denied the *Daubert* motions on the ground that they challenged Shaffer's

16

assumptions, not a methodology based on his expertise, and therefore were not the proper subject of a *Daubert* challenge. (SA0039-41.)

One week later the remaining Defendants filed new motions in limine to bar Shaffer's testimony because his method of calculating each Plaintiff's "Bid Win Percentage" imposed liability on each alleged enterprise for losses caused by other unaffiliated enterprises. (JA278; Dkt. 1077, 20-27.) The district court denied the motions in limine on the ground that Shaffer's testimony went to "weight and sufficiency, not admissibility." (Dkt. 1077, 46.)

In their Rule 50(b) Motion, the Gray Defendants again argued that the jury's verdict on damages should be set aside because Plaintiffs' damages evidence failed to disaggregate damages. (Dkt 911, 13-14.) In its Rule 50 Order, the district court rejected this argument on the ground that the jury had been instructed to consider the liability of and damages caused by each defendant separately, and this instruction resolved the aggregation of damages issue. (07 Dkt. 942, 20-21.)

*Recoveries by Plaintiffs*

Prior to judgment, Plaintiffs received $9,510,000 in settlements from 50 defendants and 11 members of the Peters Group ("Settling Parties"). (Dkt. 941, 946, 917,6.) Plaintiffs did not allocate the settlement amounts among compensatory and punitive damages, and attorneys' fees and costs. (Dkt. 917, 5-7, 997.)

The district court awarded Plaintiffs $2,002,875 in trebled compensatory damages and $642,300 in punitive damages against the Gray Defendants. The court awarded Plaintiffs $13,072,399.77 in attorneys' fees and costs. (SA0088.) The court held the Gray and Sass Defendants jointly and severally liable for $8,179,529.09.

The court held the Gray Defendants jointly liable for $2,446,435.34 with each other, but not with the Sass Defendants, and the Sass Defendants jointly liable for $2,446,435.34 with each other, but not with the Gray Defendants. (*Id.*) The district court ruled that there were "significant" common issues, and that the Gray and Sass Defendants were 80% responsible for Plaintiffs' total legal fees and costs. (SA0056-88.)

## SUMMARY OF THE ARGUMENT

The Gray Defendants appeal from a total award of $13,271,139 in compensatory and punitive damages and attorneys' fees and costs arising out of a finding that the Gray Defendants caused Plaintiffs $667,625 in actual damages (pre-RICO trebling).

To reach this verdict, the jury had to have concluded that BG and Atlantic fraudulently registered for Tax Sales in violation of the Rule. But the evidence showed nothing more than that the poorly worded Rule was subject to multiple interpretations. The chief legal counsel of the Treasurer's Office testified that she could come up with "7,500" different interpretations of the representations of compliance with the Rule. Certainly the Rule allowed for the Grays' conclusion that either BG or Atlantic could participate in the same sale as Wheeler-Dealer when neither had a relationship with Wheeler-Dealer except that they purchased services from the same company and had separate lines of credit guaranteed by the same guarantor. Indeed, the district court concluded that interpretation was "reasonable." But the district court failed to recognize, and failed to adequately

instruct the jury, that if the Gray Defendants' interpretation was reasonable, then their statements were not false, let alone knowingly false.

The evidence also showed that the interpretation and enforcement of the Rule was entirely at the discretion of the Treasurer who never enforced the Rule to bar the Grays, or anyone else, from the Tax Sales. And the evidence did *not* show that had the Treasurer been presented with the allegedly concealed facts about the "Gray Enterprise", she would have barred some or all of them from participating in any sale. Thus the Plaintiffs did not prove that the Gray Defendants' registration statements, even if they had been intentionally false, were material. For this reason as well, Plaintiffs failed to prove fraud.

The jury verdict was a muddle. The jury found BG and Atlantic liable on substantive and conspiracy RICO counts and the state law tort claim. But it found Bonnie Gray, who owned BG and completed its allegedly fraudulent registration forms, liable only on the substantive RICO count, even though the fraud underlying that RICO count was the same as that underlying the common law claim for which she was found not liable. And the jury reached no verdict on the liability of the Wheeler-Dealer Defendants on any count, even though it was their presence at the Tax Sales that allegedly made the registrations false.

These incongruous verdicts can only be explained by the circumstances of the trial and the district court's failure to give the jury the tools it needed to sort through the evidence. One of the Gray Defendants' defenses was that they did not believe that at the times that BG and Atlantic, respectively, participated in Tax

Sales at which Wheeler-Dealer was bidding, either company was "related" to Wheeler-Dealer in any way that prohibited BG or Atlantic from bidding in those sales in compliance with the Rule, and that their interpretation of the ambiguous Rule was reasonable. The district court refused to give a jury instruction that accurately presented that defense, even though the evidence supported it.

Without an instruction that fairly presented the Gray Defendants' defense, it would have been difficult for the jury to sort through the evidence to evaluate that defense. Plaintiffs went to trial on RICO and state law claims against dozens of defendants allegedly comprising three unrelated RICO enterprises that competed against Plaintiffs for tax liens over five years. The evidence regarding the alleged "Gray Enterprise" was only a small part of the case, and some of that evidence focused on relationships between Wheeler-Dealer and other Gray Defendants that never registered at the Tax Sales.

The jury's damages award is also unsupportable because the district court failed to perform a *Daubert* review of a statistical sampling method that Shaffer employed. Shaffer had *no* information about the bids that Plaintiffs actually placed at Tax Sales, and knew that the "intended" bid information he used as a proxy for actual bids was not accurate. To correct for this error he took a tiny sample – *two* hours of *one* Tax Sale - and extrapolated across *528* hours spanning five years of Tax Sales without even considering whether the sample was adequate. Had the district court subjected this method to *Daubert*, it would have found it inadmissible.

The district court made a second error when it admitted Shaffer's testimony, and then allowed the jury verdict to stand, even though Shaffer's model caused the Gray Defendants to be held liable for losses caused by the participation of other unrelated parties at the Tax Sales. Shaffer calculated each Plaintiff's "Bid Win Percentage" to determine the number of liens to be reallocated from the Gray Defendants to Plaintiffs. But the equation he used compared the Plaintiffs' successful bids to a pool of "Eligible Bidders" that excluded not just the Gray Defendants – but *all* Defendants and the Peters Group. By calculating the "Bid Win Percentage" in this manner, Shaffer calculated a higher damage award against the Gray Defendants than if he had excluded only the Gray Defendants from the equation. His method did not give the jury the tools it needed to determine which damages, if any, were legally caused by the Gray Defendants, and produced verdicts that held the Gray Defendants liable for losses allegedly caused by unrelated parties.

Finally, the district court made a similar error when it charged the Gray Defendants with 80% of the fees and costs associated with proving the case against *all* Defendants, without explanation and without considering the proportionality of the fees to the resources devoted to the case against, or damages obtained, from the Gray Defendants, and without allocating a portion of the settlement payments received by Plaintiffs to fees and costs.

# ARGUMENT

## I.    There Was Insufficient Evidence for the Jury to Find Mail Fraud.

### A.    *Standard of Review*

This Court reviews a district court's denial of a motion for judgment as a matter of law *de novo*. The district court will be reversed if this Court finds that there was not a legally sufficient evidentiary basis for the jury's verdict. Fed. R. Civ. P. 50(a)(1); *May v. Chrysler Group, LLC*, 692 F.3d 734, 742 (7th Cir. 2012). This Court must decide whether the evidence supports the jury's verdict and whether the jury was irrational to reach its conclusion; a mere scintilla of evidence is not enough. *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000).

### B.    *There Was Insufficient Evidence for the Jury to Find that the Gray Defendants Intentionally Made False Statements Because Plaintiffs Did Not Negate the Evidence that the Gray Defendants' Interpretation of the SSB Rule Was Reasonable.*

Plaintiffs did not present sufficient evidence to support the jury's finding that the Gray Defendants intentionally submitted false certifications and representations of compliance with the Rule. Plaintiffs' evidence showed only that members of the alleged "Gray Enterprise" interpreted the Rule differently from the way Plaintiffs contend it should be interpreted. This is not enough. Knowledge of falsity is essential to a finding of fraud. *United States v. Thyfault*, 579 F.3d 748, 751 (7th Cir. 2009). A person cannot act with the intent to defraud if he relies on a good faith interpretation of a regulation. *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018-19 (7th Cir. 1999) (no reason to believe that defendant with reasonable interpretation of statute intended to flout regulations).

In false statement cases where the regulation is alleged to be ambiguous, the plaintiff must both present knowledge of falsity *and* negate all reasonable interpretations of the regulation to prove scienter. *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994); *United States v. Anderson*, 579 F.2d 455, 459-60 (8th Cir. 1978) (reversing convictions in false statement case because government failed to clarify ambiguities in certification clause and failed to negate defendant's reasonable interpretation of statute); *United States v. Kersulis*, No. 00 CV 0636, 2007 U.S. Dist. LEXIS 6341, at *41-43 (E.D. Ark. Jan. 29, 2007). (summary judgment appropriate even if plaintiffs' interpretation of statute was correct because they could not prove falsity where statute subject to differing interpretations).

Plaintiffs failed to prove that the Gray Defendants' interpretation of the Rule was unreasonable, and therefore their RICO and tort claims fail.

1.     The SSB Rule is ambiguous.

The SSB Rule is imprecise enough to accommodate more than one reasonable interpretation of what it forbids and what it allows. The Rule is called the "Single, Simultaneous Related Bidding Entity Rule." (PX 390, 12.) But the Rule's prohibition does not actually use the term "Related Bidding Entity."  It states:

> One tax buying entity (principal) may not have its/his/her/their actual or apparent agents, employees, or related entities, directly or indirectly register under multiple registrations for the <u>intended or perceived</u> purpose of having more than one person bidding at the tax sale at the same time for the <u>intended or perceived</u> purpose of increasing the principal's likelihood of obtaining a successful bid on a parcel.

(PX. 390) (emphasis in original.)

Elsewhere, the Rule attempts to define a "Related Bidding Entity" as one that somehow has an ownership interest in common, or contractual relationship, with another registrant. But the Rule does not consistently employ that term ("Related Bidding Entity") to describe forbidden relationships. Instead, the Rule states its prohibition using more elusive language, "directly or indirectly register", "intended or perceived purpose", "directly or indirectly related," and "entities perceived to be related."  The Rule gives no guidance on how one can "indirectly register" for the Tax Sale, or what makes entities "indirectly related."  And a registrant can only guess whether certain relationships would be *perceived* to violate the Rule. Certainly the registrant cannot certify as true or false that others will not "perceive" a violation.

The only thing that may be clearly discerned from the Rule and the representations and warranties is that *registrants* should not use "finances in common." But the unrefuted testimony of Martha Mills evidenced the ambiguity of even that prohibition. Ms. Mills testified that she could "come up with 7,500 explanations" for what the phrase "finances in common" might mean, "but it would be speculation."  (JA125-26.)

Ms. Mills also testified that the Rule has never been enforced against a bidder, so there is no precedent to help a bidder determine what is disallowed. (JA112-15.) Moreover, personnel in the Treasurer's Office are forbidden from opining on a registrant's eligibility. (Tr. 2810, 3014-15.) A registrant has no guidance, beyond its own reasoning, as to what constitutes a violation.

2.    The Grays' interpretation of the SSB Rule was reasonable.

The evidence established that the Gray Defendants' interpretation of the
Rule was reasonable. David Gray and Timothy Gray testified that they believed
they were in compliance with the Rule because there was no common ownership or
control, contractual relationship or joint finances among the *registered entities* at
any Tax Sale. (JA0029-30, 63-65.) Timothy believed he was in compliance with the
Rule because he had no relationship with BG or Atlantic that was expressly
prohibited by the definition of "Related Bidding Entity" or the relationships
enumerated in the representations and warranties, and because he only bid on
Wheeler-Dealer's behalf for Wheeler-Dealer's own financial interest. (JA0063-70.)

David Gray testified that he did not believe it was a violation of the Rule for
Wheeler-Dealer and BG or Atlantic to bid at the same Tax Sale because they were
on different lines of credit. By the same token, he testified he thought that because
BG and Atlantic were on the same line of credit, they should not bid at the same
Tax Sale. (JA0029-30.) And they never did. It was reasonable for the Grays to
believe they were in compliance with the Rule if there were no finances in common,
contractual relationship or joint ownership between the *registered entities* because,
on its face, that is all the Rule prohibits. (PX. 390, 12.) Likewise, the certification
contained in the representations and warranties required registered buyers to
represent that "at no time during the [Tax Sale] shall I, or the entity that I
represent, or an entity <u>directly or indirectly related</u> to the above tax buyer, have
*multiple bidders* registered as separate bidding entities, simultaneously bidding at
the [Tax Sale]." (*Id.*)

The Plaintiffs testified that the Rule forbids multiple bidders from participating in the Tax Sale for the benefit of the same registrant. (JA0099.) Ms. Mills testified that the purpose of the Rule was "to keep people who have their hands in the same financial pocket from bidding [against] people who basically are not in anybody's pocket but their own." (JA127-30.) Neither of these interpretations would have barred BG or Atlantic from the Tax Sales.

3.    Plaintiffs did not negate the Grays' reasonable interpretation.

There was no evidence presented at trial that negated the Grays' interpretation of the Rule. In its Rule 50 Order, the district court itself appears to have concluded that the evidence did not negate the reasonableness of that interpretation because it did not find that their interpretation was not reasonable, but rather that it was "not the *only* reasonable interpretation." (emphasis added.) (SA0011.) That is not enough to find fraud. *See United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin. Corp.*, No. 08 CV 48, 2011 WL 976482, at *8-9 (D. Neb. Mar. 15, 2008); *Kersulis*, 2007 U.S. Dist. LEXIS 6341 at *41-43.

Nor was there other evidence of intent. The Gray Defendants did not conceal their relationships with each other, or make any arrangement in advance that would allow them to benefit from each other's participation in the Tax Sales, such as an arrangement to assign liens to each other. In fact, there was no evidence that BG or Atlantic ever benefited from Wheeler-Dealer's participation in the Tax Sales or *vice versa*. Plaintiffs thus failed to prove fraud.

26

4.    There was no evidence that Bonnie Gray had fraudulent intent.

There was no evidence that Bonnie Gray had fraudulent intent. That explains why the jury found Bonnie not liable for RICO conspiracy and tortious interference. But it is inexplicable that the jury found her liable on the substantive RICO count. The fraud for which the jury found Bonnie Gray liable under RICO was the same tort that it found her not liable for under Illinois common law. It was not sufficient for Plaintiffs to prove that Mrs. Gray was associated with a RICO enterprise. They had to prove that she had the specific intent to commit fraud. *See Schultz v. R.I. Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 731 (1st Cir. 1996).

Plaintiffs submitted no evidence from which the jury could reasonably infer that Mrs. Gray intended to commit mail fraud. Mrs. Gray did not testify at trial and only a short portion of her deposition was admitted in lieu of her live testimony. Mrs. Gray is a homemaker, not a businesswoman. (JA0076.) She testified that she had very little knowledge of the operations of BG, that she was not involved in its day-to-day operations, and that she let her husband run BG because he had been successful in the business. (JA0081.) Mrs. Gray did not know what liens BG bid on, did not understand the process to purchase tax liens, and did not even have a desk at BG's offices. (JA0078-79.) Mrs. Gray submitted the registrations for BG because she was the sole (unpaid) employee of the company. (JA0044.) Her knowledge of the Rule was limited, but she believed that the registrations she submitted for BG were accurate because only one bidder ever bid for BG. (JA0085.)

C.    *Plaintiffs Presented No Evidence that the Gray Defendants' Alleged Misrepresentations Were Material.*

Even if the evidence were sufficient to establish that the Gray Defendants knowingly made false statements, the jury's verdict must be reversed because Plaintiffs failed to prove that the misrepresentations were material. Specifically, Plaintiffs presented no competent evidence that BG or Atlantic would have been banned from participating in any Tax Sales had the Treasurer known the facts Plaintiffs claim should have been disclosed. Mail fraud requires proof of a material false representation that "is capable of influencing the decision of the person or entity to which it was addressed." *Neder v. United States*, 527 U.S. 1, 25 (1999). The record is devoid of evidence that the Gray Defendants' alleged misrepresentations would have caused the Treasurer, Maria Pappas, to bar them from the Tax Sale.

Plaintiffs' own evidence established that the determination of violations of the Rule was under the "sole and exclusive discretion" of Ms. Pappas who also had sole discretion to ban violators from the Tax Sales. (PX. 390, 12; JA116-17, 123-24.) Plaintiffs presented no evidence that Ms. Pappas would have determined that any of the Gray Defendants violated the Rule, and no evidence that she would have barred BG or Atlantic from the Tax Sales. In fact, Plaintiffs presented no evidence regarding what Ms. Pappas believed to be a violation of the Rule.

Instead of calling Ms. Pappas, Plaintiffs presented the testimony of former employees of the Treasurer's Office. This testimony could not establish the materiality of the Gray Defendants' representations because these employees did

28

not determine violations of the Rule. (Tr. 2810, 3014-15.) Martha Mills, refused to even speculate about what conduct violated the Rule, and would only surmise what Ms. Pappas might have done with bidders who were found to be in violation of the Rule. But, no bidder had ever actually been found in violation of the Rule and barred from the Sale. (JA116-22.)

In *United States v. Fenzl*, 670 F.3d 778 (7th Cir. 2012), this Court reversed a mail fraud conviction arising from alleged misrepresentations made in a competitive bidding process because the prosecution failed to present competent evidence that the decision maker would have disqualified the bidder had it known of its scheme. *Id.* at 781-82. Instead of presenting testimony of the decision maker, the government presented the testimony of an investigator who could only speculate that the bidders would have been barred. This Court held that evidence was insufficient, explaining that the City's "garbled certification statement" did not make it clear whether the bidder would have been precluded from being awarded the contract. *Id.* It was "critical" for the prosecution to present testimony by the person who "decid[ed] who could be awarded the contract…If they would not have precluded its obtaining the contract, then any fraud involved in its lining up additional bidders was immaterial…" *Id.* at 781 (citations omitted).

The result should be the same here, and the district court did not conclude otherwise – it ignored *Fenzl* in its Rule 50 Order. Plaintiffs offered no testimony proving that the Gray Defendants would have been banned from the Tax Sales, only speculation about the actions the decision maker might have taken. If

29

anything, the evidence showed that BG and Atlantic would *not* have been banned.

Timothy Gray gave unrefuted testimony that Ms. Mills personally responded to a

complaint regarding Wheeler-Dealer's participation in the 2001 Tax Sale, inspected

documents showing that Timothy owned 100% of Wheeler-Dealer, and still allowed

Wheeler-Dealer to continue bidding. (JA 73-74.)

## II.   The Trial Court's Instructions on Intent and Good Faith Were Legally Insufficient Because They Failed to Adequately Inform the Jury of the Gray Defendants' Defense Theory.

###   A.   *Standard of Review*

Jury instructions are reviewed *de novo* to determine whether, taken as a

whole, they correctly and completely inform the jury of the applicable law. *Huff v.

Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). The district court will be reversed when

the instructions "misstate the law or fail to convey the relevant legal principles in

full and when those shortcomings confuse or mislead the jury and prejudice the

objecting litigant." *Id.* The district court will also be reversed if it refuses to give a

jury instruction that fully presents the defense's theory. *See Monroe v. United Air

Lines, Inc.*, 736 F.2d 394, 400-402 (7th Cir. 1984) (jury instruction containing

erroneous standard for evaluating defendant's affirmative defense required reversal

of jury verdict for plaintiffs). A district court's decision to deny a new trial is itself

an abuse of discretion if the court commits legal error in instructing the jury. 493

F.3d at 899.

B.    *The Jury Instructions on Good Faith and Intent Did Not Adequately Inform the Jury of the Gray Defendants' Theory that Their Interpretation of the SSB Rule Made Their Statements True.*

If this Court does not enter judgment for the Gray Defendants for the reasons set forth in Part I, it should overturn the verdict and give the Gray Defendants a new trial because the jury was not instructed that a defendant's reasonable interpretation of an ambiguous rule makes its representations factually true.

In false statement cases, if the issue of ambiguity is intertwined with the defendant's good faith and intent, the jury must be instructed concerning the defendant's reasonable interpretations of ambiguous requirements that make the defendant's statement factually correct. *Migliaccio*, 34 F.3d at 1525; *United States v. Isley*, No. 08-14534, 2010 WL 801736, at *8 (11th Cir. Mar. 10, 2010) (affirming jury instruction that the government has the burden of proof to establish that defendant's statements were not a reasonable interpretation).

Defendants requested that the district court give the following jury instruction that fully conveyed the applicable law regarding the defense that their good faith belief of compliance with the Rule made their statements not false:

> Good faith constitutes a complete defense to mail fraud. A statement is made in good faith if it represents a reasonable interpretation of applicable rules or regulations. Statements made when there is a good faith disagreement about the applicable governing law or when the law is unclear are not false. Therefore, if you find that a Defendant violated the SSB Rule, but that the Defendant had a good faith belief that it complied with the SSB Rule, then your verdict must be for the Defendant.

(JA206.) This instruction was consistent with instructions that have been approved in similar cases where the defendant asserted that its interpretation of a rule was reasonable. *See, e.g., Isley,* 2010 WL 801726, at *8 n.22. (jury instructed that "[a] statement or claim is not knowingly and willfully false if it is the subject of a disputed legal question or if it represents a reasonable interpretation of applicable rules and regulations").

The district court nevertheless refused to give the requested instruction, concluding that it was "unduly argumentative," essentially "like a directed verdict," and that the jury was adequately instructed because it was told that "[g]ood faith on the part of a defendant is inconsistent with intent to defraud. A defendant is not required to prove that it acted with good faith; rather, the plaintiffs must prove that the defendant acted with the intent to defraud." (SA0031, 37-38.)

The district court wrongly concluded that its instruction was adequate. The court relied on case law that does not address the false statement case where the defense theory is that defendant's reasonable interpretation of an ambiguous regulation makes his statements true. *See* SA0031-32.

The more relevant precedent is *Migliaccio*, where the Tenth Circuit held that instructions like the one given by the district court in this case only address the situation where a defendant makes an honest mistake, but are inadequate if the defendant's defense is that his reasonable interpretation of an ambiguous regulation made his statements factually correct. 34 F.3d at 1525. In *Migliaccio*, the defendant was charged with mail fraud for falsifying Medicare claims. His defense

was that the reporting requirements were ambiguous, and his reasonable interpretation of them made his statements not false. *Id.* The district court instructed the jury, in part, that "good faith is simply inconsistent with the intent to obtain money or property by means of false or fraudulent pretenses…" *Id.* The Tenth Circuit reversed and remanded the case for a new trial, holding that the jury instruction did not fully inform the jury of the legal foundation of the defendant's defense.

The Gray Defendants were likewise entitled to have the jury instructed that their interpretation of an ambiguous rule made their representations to the Treasurer's Office not false. *See Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 478-79 (7th Cir. 1997); *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1344 (7th Cir. 1995) (a party is entitled to have his proposed instruction read to the jury if it is supported by the law and the evidence at trial). This theory was central to their defense and, as shown in Part I.B., the evidence was sufficient to establish that the requested instruction should have been given. The proposed instruction was necessary to inform the jury of the legal implications of the Rule's ambiguity, and the Plaintiffs' burden to negate the Gray Defendants' reasonable interpretation.

## III. No Predicate Acts of Mail Fraud Occurred Because Plaintiffs Were Not Deprived of their Property.

The Gray Defendants adopt Parts I.A.-I.B. of the Sass brief

## IV. The Gray Defendants Deserve a New Trial Because the Jury Was Not Properly Instructed on the Property Interest Required for Mail Fraud.

The Gray Defendants adopt Part II of the Sass brief.

## V. The District Court Erred When It Admitted the Statistical Methodology of Plaintiffs' Damages Expert Without Reviewing It for Compliance with *Daubert.*

### A.    *Standard of Review*

When reviewing a district court's decision to admit or exclude evidence challenged as inadmissible under *Daubert* , 509 U.S. 579, this Court reviews *de novo* whether the district court correctly applied *Daubert's* framework. *Kunz v. DeFelice,* 538 F.3d 667, 675 (7th Cir. 2008). If the district court has properly applied the framework, this Court reviews its decision to admit or exclude expert testimony for abuse of discretion. *Id.*

### B.    *The Video Bid Adjustment was a Statistical Method Subject to Daubert Review.*

Defendants challenged the admissibility of Shaffer's testimony on several grounds, including Shaffer's use of the "Video Bid Adjustment" to extrapolate the number of 0% bids that Plaintiffs *actually* placed at every Tax Sale from 2003-2007 from data of two hours of the 2007 Tax Sale that was less than 1% of the total hours of the 2003-2007 Tax Sales. The two-hour video was too small a sample to reliably estimate the number of bids placed at other sales.

The district court grouped the challenge to the Video Bid Adjustment with several other challenges to Shaffer's analysis, and concluded that Defendants were merely challenging *assumptions* Shaffer made in reaching his opinion, rather than objecting to a *methodology* that was the product of his expertise. It ruled that Defendants' objection to the Video Bid Adjustment was not properly the subject of a *Daubert* challenge, and thus it performed no *Daubert* review. (SA0039.)

FRE 702 requires the district court to determine whether expert scientific testimony is both relevant and reliable before it admits that testimony. *Daubert,* 509 U.S. at 589. The district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93. The court must assure itself that the opinions expressed by the expert "adhere to the same standards of intellectual rigor that are demanded in [the expert's] professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

Opinions relying on statistical methods must be subjected to *Daubert* review before they are admitted into evidence. *ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 889 (7th Cir. 2011) (reversing judgment where district court failed to conduct adequate *Daubert* review and admitted flawed regression analysis). Evidence based on extrapolation from small samples, without statistical analysis showing that the sample is representative, is not sufficiently trustworthy to permit a trier of fact to draw reasonable inferences from the evidence. *Espenscheid v. Directstat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) (affirming denial of class certification because proposed statistical method for determining class-wide damages relied on inadequate sample); *Am. Honda Motor Corp., Inc. v. Allen*, 600 F.3d 813 (7th Cir. 2010) (reversing grant of class certification where expert report was unreliable because it extrapolated results from inadequate sample); *DeKoven v. Plaza Assocs.,* 599 F.3d 578 (7th Cir. 2010) (affirming district court's rejection of

consumer survey evidence based on "convenience sample" too small to support a reliable extrapolation).

The "Video Bid Adjustment" was just as much a statistical method as the extrapolations reviewed in *Espenscheid, American Honda* and *DeKoven*. In estimating the number of bids won by the alleged Gray Enterprise that were *eligible* for reallocation to Plaintiffs, Shaffer discovered that Plaintiffs' bid lists did not show the properties on which Plaintiffs *actually* submitted 0% bids and lost. Shaffer discovered this error - a roughly 20% differential - when he compared a video showing Plaintiffs' actual bids over the course of 2 hours in 2 days at the 2007 Tax Sale to data identifying the bids that Plaintiffs claim they intended to make at that Tax Sale. (JA147:21-149:25; 177:2-22; 178:17-179:13.) To correct for this known error, Shaffer extrapolated the 20% correction across every day of every Tax Sale from 2003-2007. (JA151:1-15.) The video sample from which he made this extrapolation over several years of auctions showed less than 1% of the 528 hours of those auctions. (JA178:17-179:13.)

The district court mistakenly treated the asserted unreliability of this method as a problem that should be tested in cross examination. Believing the "Video Bid Adjustment" was just an assumption Shaffer made, not a methodology that was the product of his expertise, the court declined to subject the methodology to *Daubert* review. (SA0039). Ironically, the district court concluded that Shaffer's statistical method need not be tested under *Daubert* because the method was

36

outside his expertise, though the court wrongly concluded that the relevant expertise was in tax lien bidding, not statistics. (*Id.*) The court explained:

> Neither plaintiffs nor Shaffer suggest that he has any particular expertise that would have permitted him to ascertain whether plaintiffs actually acted in accordance with their intent as set forth on the bid lists, or whether the video of the… tax sale is representative of what occurred at other tax sales. In short, neither the bid figures that Shaffer uses as his starting point nor the so-called video adjustment are derived in any way, shape, or form from any expertise that Shaffer possesses. Rather, they are estimates that are based on a series of assumptions.
>
> The district court misconstrued the nature of the "Video Bid Adjustment."

Shaffer's extrapolation of the information in the two-hour video to correct errors across years of Tax Sales was not an assumption. It was a statistical method. *See Espenscheid*, 705 F.3d at 770; *see also* David Cope, *Fundamentals of Statistical Analysis* 28-29 (2005). A questionable methodology is not something merely to be poked at in cross-examination. *ATA*, 665 F.3d at 889. Its shortcomings must first be examined by the court to determine whether they are disabling. To be admissible, a scientific methodology must "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Apple v. Motorola*, No. 11-cv-08540, 2012 WL 1959560, at *2 (N.D. Ill. May 22, 2012) (Posner, J. ) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The district court's failure to review the "Video Bid Adjustment" under *Daubert* is, in and of itself, an error that requires reversal. In *ATA,* this Court held that a district court's determination that alleged weaknesses in a regression analysis were matters to be explored on cross examination "did not discharge the

duty of the district judge to evaluate in advance of trial a challenge to the admissibility of an expert's proposed testimony." 665 F.2d at 889. And in *American Honda,* this Court held that the district court abused its discretion when it "never actually reached a conclusion about whether [the expert's] report was reliable enough to support Plaintiffs' class certification request." 600 F.3d at 816. In this case, the district court failed in that duty just as much as the district courts did in *ATA* and *American Honda.*

      C.    *The Video Bid Adjustment Was Not a Reliable Statistical Method.*

Had the district court done a *Daubert* analysis, it would have found that Plaintiffs could not establish that the Video Bid Adjustment was a reliable methodology because the video showed less than 1% of the total hours of bidding at the Tax Sales and because no sampling error analysis was performed to test the method, which extrapolated the video sample across several years of Tax Sales. (JA178:17-179:13.) Shaffer testified that he did not know whether his "calculations represented a statistical sample of the liens subject to reallocation" and that this information was not important to him. (JA151:16-20.) Shaffer made no determination about whether the sample on the video was large enough as a statistical matter to make reasonable predictions about other time periods. For example, he was aware of no facts supporting his assumption that the Plaintiffs' bidding practices and ratio of intended to actual bids were comparable in other parts of the Tax Sale in 2007, or in other years. (JA182:13-184:20; 200:17-202:25.)

Shaffer effectively admitted that he had no basis to apply the Video Bid Adjustment to any period other than the period shown in the video. This was a fatal

problem - the same one this Court identified reviewing an order decertifying a class of plaintiffs alleging unfair wage practices in *Espenscheid.* In that case, plaintiffs assumed that a class of 2,341 members could prove damages based on a representative sample of 42 plaintiffs. Noting that there was no suggestion that statistical sampling methods were used to identify the sample group, this Court rejected the proposed approach. "To extrapolate from the experience of the 42 to that of the 2,341 would require that all 2,341 have done roughly the same amount of work; including the amount of overtime work, and had been paid the same wage. No one thinks there was such uniformity." 2013 U.S. App. Lexis 2409 at *9. (citations omitted).

Likewise, no one, including Shaffer, has a basis to conclude that despite changes in the portfolio of properties, and competition for the parcels, for sale at each auction, that there would be uniformity in Plaintiffs' won bids year in and year out.

Because the district court failed to apply *Daubert* to determine the admissibility of Shaffer's opinion using the Video Bid Adjustment, and because Plaintiffs failed to show that the Video Bid Adjustment was a reliable method, the judgment should be reversed, as in *ATA.* At the very least, the case must be remanded for the district court to conduct a proper *Daubert* analysis.

**VI.** **The District Court Erred in Upholding the Jury's Damages Award Where Plaintiffs' Damages Evidence Failed to Disaggregate the Damages.**

A. *Standard of Review*

This Court reviews a district court's denial of a motion for judgment as a matter of law *de novo*, and the district court will be reversed if this Court finds that there was not a legally sufficient evidentiary basis for the jury's verdict. Fed. R. Civ. 50(a)(1); *May*, 692 F.3d at 742. The measure of allowable damages is a question of law that this Court reviews *de novo. Rexam Beverage Can Comp. v. Bolger*, 620 F.3d 718, 727 (7th Cir. 2010).

B. *Shaffer's Calculation of Plaintiffs' "Bid Win Percentage" Improperly Attributed to the Gray Defendants Losses Caused by the Participation in the Tax Sales of Other Unrelated Parties.*

A defendant charged with fraud may only be held liable for losses legally caused by the defendant's fraud. *Movitz v. First Nat'l Bank of Chi.,* 148 F.3d 760, 763-764 (7th Cir. 1998) (reversing judgment where plaintiff failed to prove defendant was legal cause of damages). And "when a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage." *MCI v. AT&T,* 708 F.2d 1081, 1162 (7th Cir. 1982).

When the plaintiff's' expert's damages analysis does not give the jury the tools to distinguish between damages caused by the defendant's illegal conduct and damages caused by other factors, the case must be remanded to the district court for

a retrial on damages. *See Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987).

Shaffer's damages opinion did not give the jury the tools to distinguish between damages caused by the participation of BG and Atlantic in the Tax Sales, and losses caused by other unrelated parties. Indeed, Shaffer's analysis steered the jury towards holding the Gray Defendants responsible for damages caused by other parties. When Shaffer estimated each Plaintiff's "Bid Win Percentage" - the percentage he used to determine the number of bids that should be reallocated from the Gray Defendants to the Plaintiffs - he divided the number of 0% bids won by each Plaintiff each year by the number of 0% bids won by the entire group designated by Plaintiffs as that year's "Eligible Bidders," which excluded not only the Gray Defendants, but all the other Defendants and the members of the settling Peters Group. (JA155:15-56:15.)

As a matter of math, a larger group of "ineligible bidders" means a smaller denominator and a higher "Bid Win Percentage," which in turn results in a larger number of liens reallocated from the Gray Defendants to the Plaintiffs. (JA198:3-10.) Put another way, under Plaintiffs' theory, the Gray Defendants owe more money if the Peters Group (and the other Defendants) were tortfeasors and less money if those groups were not tortfeasors. Had Shaffer isolated the alleged wrongful conduct of the members of the so-called "Gray Enterprise" - by calculating a win percentage based on the number of liens BCS would have won in 2003 had *only the "Gray Enterprise"* been deemed ineligible – BCS' win percentage would

41

have been reduced from *12.45% to 5.2% (566 divided by 10,936 "Eligible Bidders" plus all non-Gray Defendants and the Peters Group).* (Dkt. 911, 12-13.)

There is no acceptable explanation for Shaffer's decision to perform a single calculation that grouped together all the Defendants rather than a defendant by defendant calculation of the "Bid Win Percentage." Plaintiffs admitted that Shaffer could have calculated damages specific to each defendant or specific to each "enterprise." (05 Dkt. 390.) But that would have resulted in a lower damage award against the Gray Defendants. (JA198:3-10.) Shaffer's failure to isolate each defendant means that the damages theory Plaintiffs presented to the jury imposed on the Gray Defendants the obligation to pay for losses caused by the participation of other parties in the Tax Sales. The district court allowed this to happen even though it previously and inconsistently held that the Gray Defendants were not entitled to a set off for damages paid by other settling defendants because those defendants were part of separate enterprises that caused separate damages. (SA0046.)

The district court rejected the Gray Defendants' challenge to Shaffer's calculation of the "Bid Win Percentage" on the ground that the jury had been instructed to consider the liability of and damages allegedly caused by each defendant separately, and that the instruction resolved any issue about the aggregation of damages. (SA0020-21.) The district court was wrong as a matter of law to conclude that the shortcoming in Plaintiffs' damages evidence could be corrected by a jury instruction. In *Movitz,* this Court reversed a damages award

where the jury was instructed on the difference between loss causation and transaction causation, but the plaintiff only presented evidence of the latter. 148 F.3d at 765. This Court should do the same here.

## VII.    Plaintiffs Were Not Entitled to Punitive Damages.

A.    *Standard of Review*

*See* Part V.A, *supra.*

B.    *The Jury's Award of RICO Treble Damages and State Law Punitive Damages for the Same Injury Violated Illinois Law.*

The jury's award of common law punitive damages and RICO treble damages against the Gray Defendants should also be reversed because it amounts to a double recovery for the same alleged wrong. In its order rejecting Defendants' challenge to that award, the district court both misconstrued the issue decided by this Court in *Perez v. Z Frank Oldsmobile*, 223 F.3d 617, 620-21 (7th Cir. 2000), and wrongly assumed that punitive damages was an issue of federal law.

Illinois law, not federal law, determines what damages are recoverable on Plaintiffs' state law claim for tortious interference with prospective economic advantage. *Davis v. Suran*, No. 98 C 656, 1998 U.S. Dist. LEXIS 10237, at *9 (N.D. Ill. July 1, 1998). In *Perez,* this Court recognized that Illinois law forbids the award of both cumulative damages multipliers and common law punitive damages for a single wrong. 223 F.3d at 620-21. This Court recognized that Illinois law does not allow the recovery of two types of damages that serve the same purpose of punishing and deterring certain types of conduct for the same injury. *Id.* at 621 (citing cases).

In its January 2, 2012 order, the district court stated that *Perez* was distinguishable because it barred a plaintiff from recovering treble damages under both state and federal multiplier statutes. The district court concluded that *Perez* did not control because RICO treble damages are compensatory, not punitive, and therefore there was no duplication of damages as in *Perez*. (SA0051.)

The district court was wrong about RICO law in this Circuit and *Perez*. This Court has held that RICO treble damages are both punitive and compensatory in nature. *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 (7th Cir. 1987). And in *Perez*, the issue was the same as the issue in this case – does *Illinois* law allow a jury to award both treble statutory damages and punitive damages for common law fraud for the same injury? This Court held that it does not, *Perez*, 223 F.3d at 621, 624, because Illinois courts have repeatedly held that treble damages provisions *are* punitive in nature. *See, e.g., Paulson v. Cnty. of DeKalb*, 644 N.E.2d 37, 38-39 (Ill. App. Ct. 1994); *People ex rel. Fahner v. Climatemp, Inc.*, 428 N.E.2d 1096, 1098-99 (Ill. App. Ct. 1981); *Marsella v. Shaffer*, 754 N.E.2d 411 (Ill. App. Ct. 2001).

Thus Illinois courts have consistently denied common-law punitive damages where treble damages had been awarded under various state and federal statutes for the same wrong. *See Harris v. Manor Healthcare Corp.*, 489 N.E.2d 1374, 1378-79 (Ill. 1986); *Verdonck v. Scopes*, 590 N.E.2d 545, 550 (Ill. App. Ct. 1992). Here, Plaintiffs argued below that the very same evidence that justified the jury's verdict on compensatory damages was all that was needed to support the jury's punitive

damages award.[5] *Perez* therefore requires that this Court apply Illinois law and reverse the jury's award of punitive damages on Plaintiffs' state law claim because they amount to double recovery for the same injury.

## VIII. The District Court's Allocation of $9,785,741.35 of Attorneys' Fees and Costs to the Gray Defendants was an Abuse of Discretion.

### A. *Standard of Review*

The appellate court reviews the district court's award of attorneys' fees for an abuse of discretion. *Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.*, 574 F.3d 852, 857 (7th Cir. 2009).

### B. *The District Court Abused Its Discretion by Apportioning $9,783,741.35 in Fees and Costs to the Gray Defendants Without Explanation Where the Award Was Disproportionate to the Resources Devoted to Proving the Case Against the Gray Defendants and the Damages Award Against those Defendants.*

The district court found that Plaintiffs reasonably incurred fees and costs totaling $13,072,399.77. Without explanation, the district court apportioned roughly 80% of this liability, $9,785,731.35[6], to the Gray Defendants. That award, totaling over 4.5 times the amount of RICO damages for which the Gray Defendants were found liable, was an abuse of discretion. In support of this argument, the Gray Defendants incorporate the legal analysis of the Sass brief at Part. IV.A.

---

[5] For this reason, Plaintiffs are not entitled to punitive damages even in absence of the RICO claim because Plaintiffs did not prove *more* conduct by the defendant than what is necessary to prove the tort. *Cress v. Recreation Serv., Inc.*, 795 N.E.2d 817 848-49 (Ill. App. 2003) (vacating award of punitive damages for tortious interference claim because no evidence presented in addition to that which proved the tort).

[6] $9,785,741.35 is the total amount of fees and costs apportioned to the Gray Defendants. It is the difference between $10,625,964 (the total amount awarded) and $840,233 in expert fees that the court did not subject to the 80% apportionment.

The record shows that the "Gray Enterprise" was only a small piece of the overall litigation. First, substantial fees were incurred appealing the dismissal of the 2005 Case to the Seventh Circuit and the U.S. Supreme Court, but the Gray Defendants were not parties to that case, which was filed solely against 25 members of the Sabre Enterprise. (Dkt. 1.) Second, once they were added in 2007, the Gray Defendants were a small part of the litigation. The alleged Gray Defendants accounted for less than 10% of the defendants named in the 2005 and 2007 Case. Only two of the Gray Defendants were registered bidders at the Tax Sales during 2003-2007.

By contrast, the Sabre Enterprise had 23 bidders at the Sales. (Dkt. 997, Ex. G.) Plaintiffs required significantly more resources to pursue claims that the Sabre bidders violated the Rule than they required pursuing claims against the Gray Defendants. As a result, only a small portion of the discovery in this case was directed at the Gray Defendants. The damages award sought against the Gray Defendants was only 16% of the total amount sought by Plaintiffs. (*Id.*, Ex. F.)

Plaintiffs' effort expended on the Gray Defendants at trial was also minimal. Throughout the 17 trial days, Plaintiffs called only two live witnesses in their case against the Gray Defendants, and presented the deposition testimony of only two other witnesses. (*See* Tr. Vol. 3-4.) Plaintiffs introduced 671 trial exhibits, of which only 46 pertained, specifically, to the alleged Gray Enterprise. (Dkt. 879, 15-17.) Even Plaintiffs' recovery against the Gray Defendants paled in comparison to their recoveries from other defendants. The Gray Defendants were found liable for

$2,000,875 (including trebling), compared with $6,322,500 for the Sass Defendants (and $9.5 million in settlements). (SA0033-35.) It was improper and unfair for the district court to allocate 80% of the total attorneys' fees to the Gray Defendants, and the fee award should be reversed and remanded.

The district court also erred by failing to consider proportionality when it awarded Plaintiffs fees and costs. The Gray Defendants adopt the arguments on proportionality in the Sass Defendants' brief in Part IV.B.

C.    *District Court Abused Its Discretion by Not Allocating Some Portion of Plaintiffs' $9.5 Million Settlements to Their Fee Awards.*

Plaintiffs' fee award also should have been reduced by some portion of the $9,510,000 Plaintiffs received in settlements from the 60+ Settling Defendants. (Dkt. 941, 946, 917, 6.) Plaintiffs did not allocate their settlement amounts among damages, fees and costs, and the district court failed to offset the fee award by some amount of the settlements attributable to common attorneys' fees.[7] Had the Settling Defendants not settled their claims, they would have been jointly and severally liable for the total fee award if they did not prevail at trial. Or, had the Plaintiffs allocated their settlements among their various damages claims, the Gray Defendants would be entitled to a set-off for some portion of the amounts allocated to attorneys' fees. *See Gerber v. MTC Elec. Techs. Co., Ltd.*, 329 F.3d 297, 303-04 (2d Cir. 2003) (non-settling RICO defendants entitled to judgment credit for

---

[7] The district court acknowledged that allocation of the settlements was proper when it allocated 46% of the Sabre Defendants' settlements to punitive damages and ruled that the Sass Defendants were only entitled to a judgment offset of 54% because the Sass Defendants were not entitled "to a setoff of amounts paid to settle punitive damages exposure[.]" (SA0050.)

amounts allocated to attorneys' fees); *Va. Acad. of Clinical Psychologists v. Blue Shield of Va.*, 543 F. Supp. 126, 152-53 (E.D. Va. 1982) (applying credit for settlement amounts allocated to fees).

Because the Plaintiffs made no allocation, the non-settling Defendants were forced to bear 100% of the burden of the common fees and costs. It is fundamentally unjust for the Gray Defendants' liability to be increased solely because the Plaintiffs failed to allocate a portion of their settlements to attorneys' fees. *See Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1208-09 (10th Cir. 1988) (unfair for non-settling defendant to suffer consequences where settlement agreement does not expressly state how damages are apportioned). The district court had broad discretion to apportion the fees and costs award and reduce it to account for the settlements. It erred by not reducing the Plaintiffs' fees and costs award.

## CONCLUSION

For the foregoing reasons, the Gray Defendants respectfully request that the Court vacate the jury's verdict against the Gray Defendants and vacate the jury's award of punitive damages on the state law claim. Alternatively, the Gray Defendants ask this Court to vacate and remand for a new trial or to properly calculate damages. The Gray Defendants also ask this Court to vacate and remand for a reasonable award of attorneys' fees and costs.

DATED:  March 27, 2013                 Respectfully submitted,


                                       BG INVESTMENTS, INC., BONNIE J.
                                       GRAY, BONNIE GRAY, as EXECUTOR OF
                                       THE ESTATE OF DAVID R. GRAY and
                                       TRUSTEE OF THE E DAVEID GRAY
                                       REVOCABLE TRUST, MIDWEST REAL
                                       ESTATE INVESTMENT CO., MIDWEST
                                       REAL ESTATE INVESTMENT CO.,
                                       EMPLOYEES' PROFIT SHARING PLAN &
                                       TRUST and ATLANTIC MUNICIPAL CORP.

                                       By:   /s/Edward F. Malone
                                             One of Their Attorneys

                                       Edward F. Malone (Counsel of Record)
                                       Sharon E. Calhoun
                                       BARACK FERRAZZANO KIRSCHBAUM
                                          & NAGELBERG LLP
                                       200 West Madison Street, Suite 3900
                                       Chicago, IL  60606
                                       Tel. (312) 984-3100
                                       Fax. (312) 984-3150
                                       ed.malone@bfkn.com
                                       sharon.calhoun@bfkn.com

## RULE 32(a)(7)(C) CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains  12,428 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 1997 in 12-point Century font.

March 27, 2013                                   /s/  Edward F. Malone
                                                 Attorney for the Gray Defendants

## CERTIFICATE OF SERVICE

The undersigned, an attorney, state that I am lead counsel for Defendants-Appellants BG Investments and do hereby certify that I have caused a true and correct copy of the attached Brief to be served upon the following via ECF transmission in compliance with Fed. R. Civ. P. 5(b)(3) and Local Rule 5.9.

March 27, 2013                    /s/ Edward F. Malone